IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

HANOVER COUNTY UNIT
OF THE NAACP,

    Plaintiff,

v.                                    Civil Action No. 3:19cv599

HANOVER COUNTY, et al.,

    Defendants.

## MEMORANDUM OPINION

This matter is before the Court on HANOVER COUNTY'S MOTION TO DISMISS (ECF No. 23) this action as to it pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. Having considered the motion and the supporting, opposing and reply memoranda, it is hereby ORDERED that HANOVER COUNTY'S MOTION TO DISMISS (ECF No. 23) will be granted.

## BACKGROUND

The COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF (the "Complaint") (ECF No. 1) names as defendants Hanover County (the "County") and the County School Board of Hanover County (the "School Board"). The Complaint asserts three claims. In Claim 1, it is alleged that the "Defendants are compelling Plaintiffs' members to express a view with which they disagree, namely that

slavery and other values of the Confederacy should be endorsed and glorified."[1] That, according to the Complaint is because:

> (1) the School Board named the Lee-Davis High School ("Lee Davis") after Robert E. Lee, the commander of the army of the Confederacy, and the Confederacy's president, Jefferson Davis, and the Stonewall Jackson Middle School ("Stonewall Jackson") after a general in the Confederate army;
>
> (2) the School Board has refused to change those names when petitioned to do so; and
>
> (3) students are required to wear athletic uniforms bearing the names 'Confederates' (Lee-Davis) and 'Rebels' (Stonewall Jackson) and are exposed to school mascots of the same names who are dressed in the uniforms of the Confederate Army.

In Claim 2, it is alleged that "the Defendants have maintained the names of the schools in honor of Confederate generals, adopted and maintained mascots, team names, and other symbols that venerate the Confederacy, and celebrates those who fought to preserve the enslavement of African Americans." (ECF No. 1 ¶ 129.) All of that is alleged to create "a school environment that denies African American students, including members of the NAACP, an equal

---

[1] In its Complaint, the Hanover County Unit of the NAACP referred to itself in the plural, "Plaintiffs." (See generally ECF No. 1.) In its later briefing, the Hanover County Unit of the NAACP referred to itself in the singular, "Plaintiff." (See generally ECF No. 32.) Because the Hanover County Unit of the NAACP is the sole plaintiff, the Court shall refer to it by either its name or as "Plaintiff."

2

opportunity to an education [in the way that is later described]." (Id. ¶ 136.) This, in turn, is an alleged violation of the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States.

In Claim 3, it is alleged that the "Defendants" violated the Equal Educational Opportunities Act, 20 U.S.C. §§ 1701-1758. However, by Stipulation entered on October 10, 2019 (ECF No. 34), the Plaintiff voluntarily dismissed Claim 3 against the County.

**DISCUSSION**

Hanover County seeks dismissal of Claims 1 and 2 because it is not a proper party to this action for the reason that, under Virginia law, the School Board, and not the County, is the final policymaker for Hanover County public schools. Consequently, the County contends that Claims 1 and 2 (alleged violations of the First and Fourteenth Amendment claims, respectively) against the County fail as a matter of law. In addition, the County alleges that the Complaint is legally insufficient because it makes no substantive factual allegations against the County that would support the First Amendment claim in Claim 1 and the Fourteenth Amendment in Claim 2. Each ground for dismissal will be discussed in turn.

**A.  The Plaintiff's Policymaking Theory of Liability**

To state a legally viable claim against a local government entity, a plaintiff must plead:  (1) existence of an official

3

policy or custom that offends the Constitution and the plaintiff's rights; (2) that the policy or custom is fairly attributable to the municipality; and (3) that the policy or custom proximately caused the deprivation of a federal constitutional or statutory right. Jordan v. Jackson, 15 F.3d 333, 338-40 (4th Cir. 1994); see also Kirby v. City of Elizabeth City, 388 F.3d 440, 451 (4th Cir. 2004); Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999). The official policy or custom facet of the test can be satisfied by pleading (and proving) that the municipality violated the plaintiff's federally-protected rights "(1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifests deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law." Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003) (quoting Carter v. Morris, 164 F.3d 215, 217 (4th Cir. 1999)) (internal quotation marks and alteration omitted); Z.G. ex rel. C.G. v. Pamlico Cty. Pub. Sch. Bd. of Educ., 744 Fed. App'x 769, 780 (4th Cir. 2018) (quoting Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003)).

Relatedly, although "municipal 'policy' is found most obviously in municipal ordinances, regulations and the like which

4

directly command or authorize constitutional violations, it may also be found in formal or informal *ad hoc* 'policy' choices or decisions of municipal officials authorized to make and implement municipal policy." Spell v. McDaniel, 824 F.2d 1380, 1385-86 (4th Cir. 1987) (internal citations omitted). Additionally, the practices for which municipalities may be found liable include custom and usage, which are the "persistent and widespread practice of municipal officials which[,] although not authorized by written law, are so permanent and well-settled as to have the force of law." Id. at 1386 (internal quotation marks and alterations omitted). These customs and usages "may be attributed to a municipality when the duration and frequency of the practices warrant[] a finding of either actual or constructive knowledge by the municipal governing body that the practices have become customary among its employees." Id. at 1387.

Neither Claim 1 nor Claim 2 alleges that the County is liable because it has an express policy, such as an ordinance or regulation. Nor do Claims 1 and 2 allege an omission of the sort that is sufficient to impose liability on a municipality or that the County has some practice that is so persistent and widespread as to constitute a custom or usage as a matter of law. That is so notwithstanding the conclusory allegation in paragraph 140 of the Complaint that the "actions of the Defendants described herein constitute an official policy and deliberate choice" because that

5

point is neither supported by factual allegations as to the County nor is it part of the Plaintiff's opposition to the County's motion to dismiss.

Thus, the only theory that seems to be presented in Claim 1 or Claim 2 as a basis for imposing liability on the County is that it is the final policymaking authority with respect to the naming and operation of the County's schools. That much is apparent from the Plaintiff's argument that "the allegations in the Complaint make clear that the County is intimately involved and exercises policymaking authority." (PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS, ECF No. 32 at 26.) Thus, in reality, the view of the Plaintiff is that the County is liable as a policymaker.[2]

State law governs whether an entity or official has final policymaking authority. City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988). And, under Virginia law, the final policymaking body for Hanover County is the Hanover County Board of Supervisors. Va. Code § 15.2-403.

Moreover, under Virginia law, the School Board is the final policymaking authority for the Hanover County Public Schools.

---

[2] The Plaintiff also says that it seeks to hold the County "directly liable for its own conduct, not for the conduct of the County's employees or the School Board." (ECF No. 32 at 25.) That theory will be addressed below in Section B: The Sufficiency of the Complaint to State a Claim Against the County Directly Because of Its Own Conduct.

6

That is clear from the Constitution of Virginia, which vests control of the public school system in the local School Boards. Va. Const. art. VIII, § 7; Riddick v. Sch. Bd. of City of Portsmouth, 238 F.3d 518, 522-23 (4th Cir. 2000); Ashby v. Isle of Wight Cty. Sch. Bd., 354 F. Supp. 2d 616, 625 (E.D. Va. 2004). Thus, the law of Virginia is clear. The County is not the final policymaking authority for the operation of the schools. The School Board is the final authority. Va. Code § 15.2-403 ("The board shall be the policy-determining body of the county . . . ."); Riddick v. Sch. Bd. of City of Portsmouth, 238 F.3d 518, 522-24 (4th Cir. 2000) (discussing school board's liability as municipality and noting that "the Constitution of Virginia vests control of the public school system in the local school boards"); Hughes v. Halifax Cty. Sch. Bd., 855 F.2d 183, 185-86 (4th Cir. 1988) ("The state constitution gives control of the school system to the school board."). The Plaintiff has identified no decisional authority contrary to that on which the County relies.

Rather, the Plaintiff argues that the County had policymaking authority with respect to the public schools of the County because the Board of Supervisors: (1) appoints the members of the School Board; (2) is empowered to appoint a person to vote to break a tie; and (3) can seek a Board member's removal. Not one of those points supports the contention that the County is the policymaking

7

authority for the operation of the schools. Also, the Plaintiff argues that the County exercises financial authority over the School Board by determining how to allocate the County's tax revenues. It is true that the Board of Supervisors sets the budget for the expenditure of the County's tax revenues, including an allocation to the School Board to spend as it determines. But that does not mean that the County is the policymaking authority for the naming and operation of the schools, because providing funding for the schools is not the equivalent of operating the schools or setting policies for their operation and the County is not alleged to have anything to do with naming the schools.

Finally, the Plaintiff contends that:

> the County has engaged in official acts to influence members of the School Board to maintain the Lee-Davis and Stonewall Jackson names: in response to her vote to change the school names, the County exercised its appointment power by deciding not to reappoint Marla Coleman to the School Board.

(PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS, ECF No. 32 at 26.) Whatever else can be made of that point, and assuming it to be true (as must be done in deciding this motion), it certainly does not show that the County is the policymaking authority for the naming and operation of the schools.

In sum, the Complaint does not allege a legally sufficient basis for a claim based on the theory that the County is a proper

party defendant because it is the final policymaker for the naming and operation of the schools in the County.

### B. The Sufficiency of the Complaint to State a Claim Against the County Directly Because of Its Own Conduct

As noted above, the Plaintiff is also of the view that its Complaint is legally sufficient to state a claim against the County directly on account of the County's "own conduct, not for the conduct of the County's employees or the School Board." (ECF No. 32 at 25.) That contention necessitates an examination of the text of the Complaint and the measuring of those allegations against the principles set out in <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009), and <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007).

The **INTRODUCTION** section of the Complaint consists of twenty-three paragraphs and obviously is intended to set the tone for the case. In paragraphs three through six of the INTRODUCTION, it is alleged that the School Board operates Lee-Davis; that the School Board approved the name "Lee-Davis"; that the School Board operates Stonewall Jackson; and that the School Board approved the name "Stonewall Jackson." The remaining paragraphs contain numerous allegations about the School Board. The only allegation about Hanover County appears in paragraph thirteen, which asserts that Hanover County was one of the last counties in Virginia to integrate its public schools. There is no factual allegation in that paragraph or elsewhere in the INTRODUCTION section that the

9

County established the names, decided to retain the names, or operates the schools. In paragraph twenty-two of the INTRODUCTION, there is the allegation that the County and the School Board have refused to put an end to the longstanding violation of the constitutional rights of its citizens. However, that is a conclusory allegation that presents no factual basis sufficient to support a claim that the County, *qua* County, violated either the First or Fourteenth Amendments asserted in Claim 1 and Claim 2.

The next sections of the Complaint deal with jurisdiction and venue and the parties. There is no substantive allegation of any conduct by the County that would violate the rights alleged to have been violated in Claims 1 and 2 (the First and Fourteenth Amendments).

The next part of the Complaint is called "**FACTUAL BACKGROUND.**" A subsection entitled "**The Confederacy**" contains nine paragraphs, none of which mention the County. The next subsection is entitled "**<u>Brown v. Board of Education</u>.**" It contains four paragraphs, none of which mention the County. The next subsection is entitled "**Virginia's 'Massive Resistance' to Desegregation,**" and none of the seven paragraphs in that subsection mention the County. The next subsection is entitled "**Hanover County's Resistance to Desegregation.**" It alleges that the County maintained a separate system until 1950 and then a separate but allegedly equal system

from 1950. However, nothing in the ten paragraphs of that subsection mentions the County except to say in paragraph fifty-nine that the County was one of the last counties in Virginia to have desegregated schools (which, elsewhere in the Complaint, is alleged to have occurred in the 1960s). Assuming that assertion to be true as must be done under Rule 12(b)(6) jurisprudence, this assertion is not support for either Claim 1 or Claim 2 because it is unrelated to the naming or operation of the schools.

At this point, it is important to understand that in paragraph fifty-one of the "Massive Resistance" subsection, the Complaint alleges that, in response to the decision in <u>Brown v. Board of Education</u>, 347 U.S. 483 (1954), the School Board (not the County) declared an intention to resist desegregation, and in paragraph fifty-two, it is alleged that the School Board (not the County), approved the name "Lee-Davis." In paragraph fifty-four, it is alleged that "Defendants" departed from the previous practice of naming schools after American figures born in the County. But that conclusory assertion does nothing to change the allegations elsewhere in the Complaint that the School Board, not the County, named and operates the schools.

The next subsection is entitled **"Defendants' Maintenance of Public School Names Adopted to Honor Prominent Confederate Leaders."** This subsection consists of seventeen paragraphs, only one of which mentions the County. In that paragraph, the Complaint

11

alleges that the County (Board of Supervisors) did not reappoint to the School Board Ms. Coleman, one of the two people who voted in favor of changing the names of the schools at issue. That allegation, even given its maximum, permissible, inferential reach, is not sufficient to support the charges made in Claims 1 and 2 because it does not support the theory that the County either named the schools (which elsewhere in the Complaint is said to have been done by the School Board) or that the County operates the schools.

The next subsection of the Complaint is entitled **"The Impact of the School Names on NAACP Members and the Community."** It consists of twenty paragraphs, none of which mention the County. Thus, it is fair to say that in the first twenty pages of the Complaint, which purport to be the factual allegations upon which the Plaintiff's claims are based, there is scant mention of the County and the few mentions that are made of the County do not link the County's conduct to the naming of the schools, the maintenance of the schools' names, or the operation of the schools, which are the predicates of Claim 1 and Claim 2. The same is true as to the sections of the Complaint that contain Claim 1 itself. That claim consists of seventeen paragraphs, not one of which mentions any misconduct on the part of the County. The same is true for Claim 2, which consists of twenty-seven paragraphs, none of which assert misconduct by the County that is at all linked to

the gravamen of the Complaint (forced compelled speech or denial of equal protection). It is correct that, in paragraph 131, the Plaintiff refers to the Defendants in the plural and that the Plaintiff does the same in paragraphs 138, 139, and 140. All of those allegations are conclusory in nature and essentially assert that the Defendants have violated the Equal Protection Clause. Conclusory allegations, such as these, are not sufficient to state a claim.

As is well-established, for a complaint to survive a Rule 12(b)(6) motion to dismiss, "the facts alleged must be enough to raise a right to relief above the speculative level and must provide enough facts to state a claim to relief that is plausible on its face." Robinson v. Am. Honda Motor Co., 551 F.3d 218, 222 (4th Cir. 2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007)) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Twombly and Iqbal thus "made clear that the analytical approach for evaluating Rule 12(b)(6) motions to dismiss requires courts to reject conclusory allegations that amount to mere formulaic recitation of the elements of a claim and to conduct a context-specific analysis to determine whether the well-pleaded factual allegations plausibly

suggest an entitlement to relief." <u>Chamblee v. Old Dominion Sec. Co.</u>, No. 3:13-cv-820, 2014 WL 1415095, at *4 (E.D. Va. Apr. 11, 2014) (quoting <u>Iqbal</u>, 556 U.S. at 680-81) (internal citations and quotation marks omitted).

The Complaint fails to make this showing as to either Claim 1 or Claim 2. As explained above, the Complaint contains few allegations directly regarding the County. To the extent that there are allegations that mention the County, these allegations primarily focus on when the County integrated its public schools. Because the Complaint does not allege any facts that plausibly support the theory that the County was responsible for naming or operating the schools, it fails to make specific and plausible allegations that the County was liable for the alleged conduct that is said to be the basis for Claim 1 and Claim 2.[3]

## CONCLUSION

For the reasons set forth above, HANOVER COUNTY'S MOTION TO DISMISS (ECF No. 23) will be granted.

It is so ORDERED.

/s/ REP
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: October 29, 2019

---

[3] The pleading technique of using the plural term "Defendants" does not, and indeed cannot, save a complaint that does not otherwise plead a plausible claim against a particular defendant.

14