**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

HANOVER COUNTY UNIT OF THE NAACP,

    Plaintiff,

v.                                    Civil Action No. 3:19-cv-599

HANOVER COUNTY AND
COUNTY SCHOOL BOARD OF HANOVER COUNTY,

    Defendants.

**MEMORANDUM OPINION**

This matter is before the Court on HANOVER COUNTY SCHOOL BOARD'S MOTION TO DISMISS (ECF No. 25) (the "MOTION"). Having considered the MOTION, the supporting, opposing, and reply memoranda, the supplemental briefing, and the arguments of counsel, it is hereby ORDERED that HANOVER COUNTY SCHOOL BOARD'S MOTION TO DISMISS (ECF No. 25) will be granted.

**BACKGROUND**

The County School Board of Hanover County (the "School Board") moves to dismiss the COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF (ECF No. 1) (the "Complaint").[1] After ordering supplemental briefing, (ECF No. 47), the Court held a hearing on the MOTION on January 14, 2020, at which the Court ordered additional briefing

---

[1] The Court previously granted Defendant HANOVER COUNTY'S MOTION TO DISMISS (ECF No. 23) on October 29, 2019. (ECF No. 42.)

addressed to Claim 2 of the Complaint, which is based on the Equal Protection Clause of the Fourteenth Amendment.

In the Complaint, the Hanover County Unit of the NAACP (the "NAACP") challenged the School Board's use of Confederate names and imagery at Lee-Davis High School ("Lee-Davis") and Stonewall Jackson Middle School ("Stonewall Jackson") as violations of NAACP members' First and Fourteenth Amendment rights and of the Equal Educational Opportunities Act. (ECF No. 1 ¶ 2.) The NAACP alleges that the schools' names and the team and student body names are "ubiquitous in student life" and that these names "feature prominently in student curricular and extracurricular activities, including sports, clubs, and performing arts." (Id. ¶¶ 61-62.)

The School Board approved the name "Lee-Davis" in 1958. (Id. ¶ 4.) Lee-Davis opened in 1959 and was not fully desegregated until the 1969-1970 school year. (Id.) Its school team and student body name is the "Confederates," and Lee-Davis uses a Confederate soldier as its mascot in official school activities (Id. ¶ 3.) When students from Lee-Davis graduate, they walk "behind a banner with pictures of Lee and Davis and the motto 'Tradition and Pride.'"[2] (Id. ¶ 10.) Lee-Davis's lobby contains banners with the school's name on it and a seal with Lee and

---

[2] It is alleged that "Tradition" "includes the defense of slavery and racial inequality," but that is not alleged to be on the banner. (Id. ¶ 10.)

Davis's images.  (Id. ¶ 63.)  The name "Lee-Davis" is also on the school's outdoor scoreboard, and the phrases "Lee-Davis Confederates" and "Tradition and Pride" are on its indoor gym scoreboard.  (Id. ¶ 64.)  "The name 'Confederates' is used when announcing players and calling plays during sporting events." (Id. ¶ 65.)  The names "Lee-Davis" and "Confederates" are also "used in school-wide chants at pep rallies and other school spirit events." (Id. ¶ 66.)  Nearly 1,500 students are currently enrolled at Lee-Davis.  (Id. ¶ 60.)  Fewer than 10% of those students are African American.  (Id.)

Additionally, in 1969, the School Board approved the name "Stonewall Jackson," and Stonewall Jackson opened in 1970.  (Id. ¶ 6.)  The school team and student body name is the "Rebels," which is a reference to Confederate soldiers.  (Id. ¶ 5.)  In front of Stonewall Jackson is a sign that says, "Home of the Rebels."  (Id. ¶ 67.)  Football uniforms have the name "Rebels" on them.  (Id. ¶ 68.)  Over 1,000 students are currently enrolled at Stonewall Jackson.  (Id. ¶ 60.)  Fewer than 10% of those students are African American.  (Id.)

The NAACP alleges that its members "are dissuaded from participating in academic and extracurricular activities" because of the school and team names.  (Id. ¶ 88.)  One NAACP member requested a variance to allow his or her child to attend a different middle school, but this request was denied, and the

3

family turned to home-schooling.  (Id. ¶ 89.)  Another NAACP
member's child attends a specialized academic program at another
high school to which the child applied "to avoid attending a school
that celebrates the Confederacy and to avoid glorifying
Confederate figures through extracurricular activities."  (Id.
¶ 91.)  Other NAACP members' children do not participate in school-
sponsored activities because of the school and team names.  (Id.
¶¶ 92-93.)

The Complaint asserts three counts.  Claim 1 alleges that the
School Board violated the First Amendment by "compelling [the
NAACP's] members to express a view with which they disagree, namely
that slavery and other values of the Confederacy should be endorsed
and glorified."  (Id. ¶ 102.)  In Claim 2, the NAACP alleges that
the School Board violated the Equal Protection Clause of the
Fourteenth Amendment by naming the schools.  (Id. ¶¶ 114-40.)
Lastly, Claim 3 alleges that the School Board has violated the
Equal Educational Opportunities Act (the "EEOA") by not changing
the schools' names and team and student body names.  (Id. ¶¶ 141-
50.)

## DISCUSSION

## I.   WHETHER THE NAACP HAS STANDING TO PROSECUTE CLAIM 1

As a threshold matter, the NAACP does not have standing to
prosecute the compelled speech claim because its members are

4

indispensable to the prosecution of that claim.  For the reasons stated below, Claim 1 will be dismissed for lack of standing.

"[T]o satisfy Article III's standing requirements, a plaintiff must show (1) that it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000).  "For an injury to be 'particularized,' it must affect the plaintiff in a personal and individual way."  Spokeo, Inc. v. Robins, 136 S.Ct. 1540, 1548 (2016) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 n.1 (1992)) (internal quotation marks omitted). Additionally, a "'concrete' injury must be 'de facto'; that is, it must actually exist."  Id.  Furthermore, to have standing, "the plaintiff must have suffered an injury or threat that is credible, not imaginary or speculative.  Cooksey v. Futrell, 721 F.3d 226, 235 (4th Cir. 2013) (quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979)) (internal quotation marks omitted).  Although "actual arrest or prosecution for violating a statute establishes an injury in fact, so too may a credible threat of prosecution thereunder."  Cahaly v. Larosa, 796 F.3d 399, 406 (4th Cir. 2015) (quoting Babbitt, 442 U.S. at 298; Steffel v.

Thompson, 415 U.S. 452, 459 (1974)) (internal quotation marks and citations omitted).

When considering standing in freedom of speech cases, the Court "must assume the [plaintiff's] claim has legal validity." Cooksey, 721 F.3d at 239 (quoting Initiative & Referendum Inst. v. Walker, 450 F.3d 1082, 1093 (10th Cir. 2006)) (internal quotation marks omitted); see also Initiative & Referendum Inst., 450 F.3d at 1093 ("[W]here the plaintiff presents a nonfrivolous legal challenge, alleging an injury to a protected right such as free speech, the federal courts may not dismiss for lack of standing on the theory that the underlying interest is not legally protected."). "[S]tanding requirements are somewhat relaxed in First Amendment cases." Cooksey, 721 F.3d at 235.

In this case, the NAACP claims associational standing—i.e., it brings this case on behalf of its members. (ECF No. 56 at 1-2.) "An association has standing to bring suit on behalf of its members when [(1)] its members would otherwise have standing to sue in their own right, [(2)] the interests at stake are germane to the organization's purpose, and [(3)] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000). "[W]hether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the

6

nature of the relief sought.  If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." Warth v. Seldin, 422 U.S. 490, 515 (1975). However, "an organization lacks standing to assert claims of injunctive relief on behalf of its members where the fact and extent of the injury that gives rise to the claims for injunctive relief would require individualized proof." Jefferson v. Sch. Bd. of Norfolk, No. 2:10-cv-316, 2010 WL 11527350, at *3 (E.D. Va. Nov. 18, 2010) (quoting Bano v. Union Carbide Corp., 361 F.3d 696, 714 (2d Cir. 2004)) (internal quotation marks omitted), aff'd 452 Fed. App'x 356 (4th Cir. 2011); see also Int'l Woodworkers of Am. v. Chesapeake Bay Plywood Corp., 659 F.2d 1259, 1267 (4th Cir. 1981) (same).  And, "an organization lacks standing to seek injunctive relief on behalf of its members when the relief requested would require the participation of individual members in the lawsuit." Jefferson, 2010 WL 11527350, at *3 (quoting Bano, 361 F.3d at 714) (internal quotation marks omitted).

    Based on the parties' briefing, the standing element at issue is the third element of associational standing—that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Friends of the Earth, Inc., 528 U.S. at 181.  This facet of the standing test requires that

the "nature of the claim and of the relief sought . . . not make the individual participation of each injured party indispensable to proper resolution of the cause . . . ."[3]   United Food & Commercial Workers Union Local 751 v. Brown Grp., 517 U.S. 544, 552 (1996) (quoting Warth, 422 U.S. at 511).

It is also true that compelled speech claims might not require individualized proof when the defendant's conduct is the "primary subject of inquiry."  See All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev., 570 F. Supp. 2d 533, 543 (S.D.N.Y. 2008) ("The compelled speech and vagueness claims do not require individualized proof, as it is the conduct of Defendants in the form of the Policy Requirement and the Guidelines that will be the primary subject of inquiry.  The Policy Requirement and the Guidelines apply to all Leadership Act grantees . . . While some individualized showing of facts common to all members to support the factual development of the Associations' compelled speech and

---

[3]    In United Food & Commercial Workers Union Local 751 v. Brown Grp., 517 U.S. 544 (1996), the Court observed that, "once an association has satisfied [the] first and second prongs assuring adversarial vigor in pursuing a claim for which member Article III standing exists, it is difficult to see a constitutional necessity for anything more," meaning that the third prong is prudentially-imposed.  Id. at 552, 556, 558 (holding that "[b]ecause Congress authorized the union to sue for its members' damages, and because the only impediment to that suit is a general limitation, judicially fashioned and prudentially imposed, there is no question that Congress may abrogate the impediment").  However, unless Congress abrogates this requirement, it is an "otherwise applicable standing limitation . . . ."  Id. at 546.

vagueness claims will be necessary, this test does not preclude granting associational standing."), aff'd by, 651 F.3d 218 (2d Cir. 2011). However, where "adjudication of the claims . . . would turn on facts specific to each student," the individualized proof prong has not been met. See Parent/Prof'l Advocacy League v. City of Springfield, 934 F.3d 13, 35 (1st Cir. 2019) (holding that prudential prong barred plaintiff from bringing suit in part because "adjudication of the claims here would turn on facts specific to each student, including unique features of each student's unique disability, needs, services, and placement").

"[F]reedom of speech includes both the right to speak freely and the right to refrain from speaking at all." Janus v. Am. Fed'n of State, Cty., & Mun. Emps., 138 S.Ct. 2448, 2463 (2018) (quoting Wooley v. Maynard, 430 U.S. 705, 714 (1977)) (internal quotation marks omitted). "In order to compel the exercise or suppression of speech, the government measure must punish, or threaten to punish, protected speech by governmental action that is regulatory, proscriptive, or compulsory in nature. In other words, in order to make out a valid compelled-speech claim, a party must establish (1) speech; (2) to which he objects; that is (3) compelled by some governmental action." Cressman v. Thompson, 798 F.3d 938, 951 (10th Cir. 2015) (quoting Axson-Flynn v. Johnson,

356 F.3d 1277, 1290 (10th Cir. 2004)) (internal quotation marks and citation omitted).

In this case, adjudication of Claim 1 will depend on facts specific to each student. Although the speech to which the NAACP objects consists of the schools' names and the student body and team names, to show that its members were compelled to speak, the NAACP would have to introduce evidence showing which members objected to which speech and how each of the members were compelled to speak. That showing necessarily requires individualized proof regarding, *inter alia*; (1) to which school names or student body and team names the specific NAACP member or member's child objected; (2) in which extracurricular activity the given NAACP member or member's child participated; (3) how and to what extent the NAACP member or member's child was compelled to speak; and (4) the steps the NAACP member or member's child took in response to the alleged compelled speech. Indeed, the NAACP's members' responses to the schools' names and team and student body names were not uniform—*i.e.*., they seem to range from acceptance, to indifference, to abstaining from extracurricular activities, to requesting a transfer, and to deciding to homeschool children. Consequently, because individualized proof is necessary to the extent that the individual participation of the NAACP's members is indispensable to the proper resolution of the case, the NAACP lacks

associational standing to assert Claim 1. Claim 1 therefore will be dismissed.

## II. THE SCHOOL BOARD'S MOTION UNDER FED. R. CIV. P. 12(b)(6)

For the reasons stated below, the Court will dismiss the Complaint for failure to state a claim because: (1) even if the NAACP had standing to assert Claim 1 (the First Amendment claim), Claim 1 fails to sufficiently allege compulsion; (2) Claim 2 (the Equal Protection claim) is barred by the statute of limitations and, even if it were not barred, Claim 2 fails to allege specific facts and instead relies on conclusory statements; and (3) Claim 3 (the EEOA claim) impermissibly relies on conclusory statements.

### a. The Standard Governing Fed. R. Civ. P. 12(b)(6): Failure to State a Claim

"A complaint should not be dismissed pursuant to Rule 12(b)(6) for failure to state a claim unless it appears to a certainty that the nonmoving party cannot prove any set of facts in support of its claim that would entitle it to relief." Chapman v. Clarendon Nat'l Ins., 299 F. Supp. 2d 559, 562 (E.D. Va. 2004). A Rule 12(b)(6) motion to dismiss "tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). Under Fed. R. Civ. P. 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader

11

is entitled to relief . . . ."   Fed. R. Civ. P. 8(a)(2).
Consequently, "[t]o survive a 12(b)(6) motion, the complaint must
contain sufficient factual matter, accepted as true, to state a
claim to relief that is plausible on its face." Rockville Cars,
LLC v. City of Rockville, 891 F.3d 141, 145 (4th Cir. 2018)
(quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)) (internal
quotation marks omitted).   "A claim is plausible on its face, if
a plaintiff can demonstrate more than a sheer possibility that a
defendant has acted unlawfully." Id. (quoting Iqbal, 556 U.S. at
678) (internal quotation marks omitted).

When considering Fed. R. Civ. P. 12(b)(6) motions to dismiss,
courts "must accept the factual allegations of the complaint as
true and construe them in the light most favorable to the nonmoving
party." Id.  However, "a court considering a motion to dismiss
can choose to begin by identifying pleadings that, because they
are no more than conclusions, are not entitled to the assumption
of truth." Iqbal, 556 U.S. at 679.   Moreover, courts do not
"accept as true a legal conclusion couched as a factual
allegation." SD3, LLC v. Black & Decker (U.S.) Inc., 801 F.3d
412, 422 (4th Cir. 2015) (quoting Anand v. Ocwen Loan Servicing,
LLC, 754 F.3d 195, 198 (4th Cir. 2014)) (internal quotation marks
omitted).   "Threadbare recitals of the elements of a cause of
action, supported by mere conclusory statements, do not suffice."
Iqbal, 556 U.S. at 678.

### b. Claim 1 Fails to Sufficiently Allege Compulsion.

Even if the NAACP has associational standing to assert Claim 1, the Court will dismiss Claim 1 because it fails to state a claim upon which relief may be granted.[4]

"The First Amendment not only protects against prohibitions of speech, but also against regulations that compel speech." Stuart v. Camnitz, 774 F.3d 238, 245 (4th Cir. 2014). Consequently, the "freedom of speech prohibits the government from telling people what they must say." Rumsfeld v. Forum for Acad. & Institutional Rights, Inc., 547 U.S. 47, 61 (2006). Compelled speech occurs when "an individual is obliged personally to express a message he disagrees with, imposed by the government . . . ." Johanns v. Livestock Mktg. Ass'n, 544 U.S. 550, 557 (2005).

Thus, the "crucial question is whether, in speaking, the government is *compelling* others to espouse or to suppress certain ideas and beliefs. In order to compel the exercise or suppression of speech, the governmental measure must punish, or *threaten to punish*, protected speech by governmental action that is 'regulatory, proscriptive, or compulsory in nature.'" Phelan v. Laramie Cty. Cmty. Coll. Bd. of Trs., 235 F.3d 1243, 1247 (10th

---

[4]    "Ordinarily, it is preferable to articulate a single basis for decision and, conversely, to refrain from making alternative holdings." Amato v. City of Richmond, 875 F. Supp. 1124, 1139 (E.D. Va. 1994). However, if this decision should be appealed, it is best under the circumstances of this case to provide alternate reasoning.

Cir. 2000) (quoting Laird v. Tatum, 408 U.S. 1, 11 (1972)) (emphasis added) (internal citations omitted); see also Frudden v. Pilling, 742 F.3d 1199, 1205 (9th Cir. 2014) ("Frudden I") ("[T]hat [the school] did not discipline the Fruddens' children is irrelevant to their First Amendment challenge."). Additionally, "preenforcement challenges to government-imposed speech restrictions are not extraordinary." Frudden I, 742 F.3d at 1205. The "consequence may be an 'indirect discouragement,' rather than a direct punishment . . . ." Phelan, 235 F.3d at 1247 (quoting Am. Commc'ns Ass'n v. Douds, 339 U.S. 382, 402 (1950)). For instance, a school "ma[king] it abundantly clear that [students] would not be able to continue in the program [or activity] if [they] refused to say the words" the school requested constitutes compulsion. Axson-Flynn v. Johnson, 356 F.3d 1277, 1290 (10th Cir. 2004). "A discouragement that is minimal and wholly subjective does not, however, impermissibly deter the exercise of free speech rights." Phelan, 235 F.3d at 1247-48 (quoting United States v. Ramsey, 431 U.S. 606, 623-24 (1977)). With respect to which level of scrutiny is relevant, generally, "laws that compel speakers to utter or distribute speech bearing a particular message are subject to rigorous scrutiny." Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt., 879 F.3d 101, 107 (4th Cir. 2018) (quoting Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 642 (1994)) (internal quotation marks and alterations omitted).

Much of the parties' briefing focused on Frudden I and Frudden v. Pilling, 877 F.3d 821 (9th Cir. 2017) ("Frudden II"). (See ECF No. 55 at 9-11; ECF No. 56 at 7-9.) In Frudden I, the Roy Gomm Elementary School ("RGES") required students to wear uniform shirts with RGES's logo on the front—a gopher with the words "Roy Gomm Elementary School." Frudden I, 742 F.3d at 1201. Underneath this logo was the written message "Tomorrow's Leaders." Id. On multiple occasions, when the Fruddens' children did not wear the uniforms, RGES's principal asked them to change into the uniform. Id. at 1202. The Ninth Circuit emphasized that "the RGES policy mandates written expression" and concluded that "by mandating the written motto on the uniform shirts, the RGES policy compels speech . . . ." Id. at 1204-05 (internal emphasis omitted). Similarly, the court rejected the argument that "the First Amendment analysis turns on an examination of the ideological message (or lack thereof) of 'Tomorrow's Leaders.'" Id. at 1206. The Ninth Circuit also explained that the fact "that RGES did not discipline the Fruddens' children is irrelevant to their First Amendment challenge." Id. at 1205.

The School Board contends that Frudden I and II do not support the claim that a school name and mascot can constitute compelled speech because Frudden II's uniforms were permissible once the motto "Tomorrow's Leaders" had been removed, even though the gopher mascot and RGES's name remained. (ECF No. 55 at 8-11.) The School

Board fails to recognize that this case is distinct from Frudden II because the "Confederates" and the "Rebels" have a historical and political context that "Tomorrow's Leaders" did not. In fact, when expressing disapproval of the court's decision in Frudden I, the panel in Frudden II emphasized that "Tomorrow's Leaders" was not the "political, content-based statement" contemplated in Wooley v. Maynard, 430 U.S. 705 (1977), which concerned the phrase "Live Free or Die" on New Hampshire license plates. Frudden II, 877 F.3d 821, 830 (9th Cir. 2017). There is a clear distinction between "Tomorrow's Leaders" and gophers and the Confederates and Rebels. The first two, respectively, are a non-political phrase and burrowing rodent; the other two are associated with the Confederacy, which historically has had political import. Because Robert E. Lee, Jefferson Davis, and Stonewall Jackson are associated with the Confederacy, the schools' names and the student body and team names combined have a historical meaning attached to them, even without an additional phrase or school motto. Indeed, "[s]ymbolism is a primitive but effective way of communicating ideas." W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 632 (1943). Consequently, as long as there is some type of compulsion, requiring students to wear apparel with names or symbols associated with the Confederacy may constitute compelled speech.

However, this question is one that the Court need not resolve at this stage because, to survive a motion to dismiss, the

16

Complaint must allege that the NAACP's members were compelled to speak. In other words, the question at issue is whether the School Board has punished or threatened to punish students for refusing to wear apparel with the schools' names or otherwise "resisting the display of their school names or mascots . . . ." (See, e.g., ECF No. 36 at 14.)  It does not appear that the School Board has done so. (See generally ECF No. 1.)  Although the NAACP alleges that students "would be forced to champion the racial inferiority that is inherent in the school names, team and student-body names, cheers, and culture," (id. ¶ 88), there is no allegation that the students refused to wear the schools' uniforms or otherwise objected to the school, student body, and team names.  There is similarly no allegation that the schools punished, threatened, or "made it abundantly clear that [the students] would not be able to continue in the program" if they did not comply with the uniform requirements.  Axson-Flynn v. Johnson, 356 F.3d 1277, 1290 (10th Cir. 2004).  Instead, the Complaint only alleges that, for instance, cheerleaders are required to wear uniforms, not that the cheerleaders were punished, threatened, or banned from the teams for refusing to wear the uniforms. (See ECF No. 1 ¶ 91.)

To state a claim for relief, the Complaint must do more than allege that students "are dissuaded from participating in academic and extracurricular activities . . . ." (Id. ¶ 88.)  Given that the Complaint does not allege a single instance in which a student

17

refused to wear uniforms or other apparel with the names at issue, let alone was punished or threatened for that refusal, the Complaint's allegations that "Defendants compel students participating in extracurricular activities to wear uniforms or other apparel bearing the names [at issue]," (id. ¶ 103), and that "Defendants compel students participating in extracurricular activities to identify as 'Confederates' and 'Rebels,'" (id. ¶ 104), are conclusory and not sufficient to state a claim for relief. Consequently, the Court will dismiss Claim 1 because it fails to allege that students objected to the school, student body, and team names and that the students were punished or threatened for their objection.

### c. Claim 2 Is Barred by the Statute of Limitations and Fails to State a Claim.

The School Board moves to dismiss Claim 2 under Virginia's statute of limitations and, alternatively, because it fails to state a claim upon which relief can be granted. For the following reasons, the Court will dismiss Claim 2 because it is barred by the statute of limitations and, even if it were not time-barred, Claim 2 relies on conclusory statements and thus does not present a plausible factual predicate for a Fourteenth Amendment claim.

### 1. The Statute of Limitations

"Ordinarily, a defense based on the statute of limitations must be raised by the defendant through an affirmative defense,

and the burden of establishing the affirmative defense rests on the defendant.  It follows, therefore, that a motion to dismiss filed under [Fed. R. Civ. P.] 12(b)(6), which tests the sufficiency of the complaint, generally cannot reach the merits of an affirmative defense, such as the defense that the plaintiff's claim is time-barred.  But in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss under Rule 12(b)(6).  This principle only applies, however, if all facts necessary to the affirmative defense 'clearly appear on the face of the complaint.'" Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007) (quoting Richmond, Fredericksburg & Potomac R.R. v. Forst, 4 F.3d 244, 250 (4th Cir. 1993)) (internal citations, alteration, and emphasis omitted).

"Section 1983 does not contain a statute of limitations. Thus, to determine the timely filing of a § 1983 claim, courts borrow the statute of limitations from the most analogous state-law cause of action.  For § 1983 suits, that cause of action is a personal-injury suit." Owens v. Balt. City State's Attorneys Office, 767 F.3d 379, 388 (4th Cir. 2014) (internal citation omitted).  Consequently, the applicable limitations period to the NAACP's § 1983 claim is Virginia's two-year statute of limitations for personal injury actions.  Va. Code Ann. § 8.01-243(A) ("Unless otherwise provided in this section or by other statute, every

action for personal injuries, whatever the theory of recovery, and every action for damages resulting from fraud, shall be brought within two years after the cause of action accrues."). When determining from which date the limitations period begins, the "proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful." Del. State Coll. v. Ricks, 449 U.S. 250, 258 (1980) (quoting Abramson v. Univ. of Haw., 594 F.2d 202, 209 (9th Cir. 1979)) (internal emphasis omitted). "Under federal law[,] a cause of action accrues when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." Nasim v. Warden, 64 F.3d 951, 955 (4th Cir. 1995).

"Ordinarily, a claim based upon allegedly discriminatory actions occurring outside of the applicable limitations period is time-barred. However, such actions may form the basis for a timely claim if they are part of a 'continuing violation.' To qualify as a continuing violation, the Fourth Circuit has stated that the alleged incidents of discrimination must constitute a series of separate but related actions such that they are manifested in a continuing violation." Demuren v. Old Dominion Univ., 33 F. Supp. 2d 469, 476 (E.D. Va. 1999) (quoting Jenkins v. Home Ins., 635 F.2d 310, 312 (4th Cir. 1980) (per curiam)) (internal quotation marks omitted). In the context of continuing violations, the

20

"critical question is whether any present violation exists." United Air Lines, Inc. v. Evans, 431 U.S. 553, 558 (1977) (internal emphasis omitted). "A continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation." Nat'l Advert. Co. v. City of Raleigh, 947 F.2d 1158, 1166 (4th Cir. 1991) (quoting Ward v. Caulk, 650 F.2d 1144, 1147 (9th Cir. 1981)) (internal quotation marks omitted). "The challenged action must be repeated within the statute of limitations period."[5] Id. at 1167.

As a preliminary matter, the facts necessary to conclude that the statute of limitations bars Claim 2 are present on the face of the Complaint. The Complaint lists the years in which the School Board named Lee-Davis and Stonewall Jackson—1958 and 1969, respectively—and also states that Lee-Davis was fully desegregated in 1969. (ECF No. 1 ¶¶ 4, 6.) Consequently, the Court can reach the merits of whether the statute of limitations bars the NAACP's claim.

---

[5]   Several courts in the Eastern District of Virginia have adopted the test from Berry v. Bd. of Supervisors, 715 F.2d 971 (5th Cir. 1983), which provides that "courts [should] analyze three factors before allowing 'stale' claims to be revived: (1) whether the alleged acts involve the same type of discrimination; (2) whether the alleged acts are frequent; and, (3) whether the alleged acts have a degree of permanence which would trigger [a plaintiff's] awareness and duty to assert his or her rights." See, e.g., Williams v. Enter. Leasing Co., 911 F. Supp. 988, 996 (E.D. Va. 1995).

At the January 14, 2020 hearing, counsel for the NAACP stated that the NAACP challenged the School Board's decision to name the schools, not the School Board's maintenance of the schools' names. (ECF No. 61 at 60:10-25.)

| | |
|---|---|
| Mr. Djoukeng: | And also a further clarifying point, Your Honor, what we're challenging here is the decisions to name Lee-Davis in 1958 and Stonewall Jackson in 1969. Those names have, of course, been maintained throughout this time, but that's what we're challenging, Your Honor -- |
| The Court: | This isn't -- contrary to what Mr. Corrigan [the School Board's counsel] said, this isn't a charge that is based on maintaining the names. It's based on imposing the names. |
| Mr. Djoukeng: | That is correct, Your Honor. |
| The Court: | Of Lee-Davis and Stonewall? |
| Mr. Djoukeng: | And Stonewall Jackson Middle School. Lee-Davis High School and Stonewall Jackson Middle School, Your Honor. |
| The Court: | All right. So the decision to name them, okay. That's what is at issue here. |
| Mr. Djoukeng: | That's correct, Your Honor. |

(Id.)

"A judicial admission is usually treated as absolutely binding, but such admissions go to matters of fact which, otherwise, would require evidentiary proof. . . . The doctrine of

22

judicial admissions has never been applied to counsel's statement of his conception of the legal theory of the case." New Amsterdam Cas. Co. v. Waller, 323 F.2d 20, 24 (4th Cir. 1963). Counsel's insistence that the NAACP challenged the naming of the schools, not the maintenance of their names, goes to matters of fact, not the NAACP's legal theory of the case. Consequently, Counsel's statement constitutes a binding judicial admission. And, that certainly is borne out by the allegations of the Complaint.[6]

Because the NAACP stated clearly that the challenged action was the naming of the schools, Claim 2 is barred under Virginia's statute of limitations. With respect to Lee-Davis specifically, because Lee-Davis was not fully desegregated until the 1969-70 school year, (ECF No. 1 ¶ 4), the latest accrual date for the Equal Protection Clause would be 1969.[7]  However, 1969 (the year Lee-

---

[6]    That counsel for the School Board thought that maintaining the names also was implicated in Claim 2 is of no moment to the analysis where, as here, counsel for the NAACP insisted that the School Board's counsel was in error in understanding Claim 2.

[7]    The NAACP cites Jacobson v. Lee, 411 F. Supp. 3d 1249 (N.D. Fla. 2019), for the proposition that its members' Equal Protection claim did not accrue until they were disparately impacted. (ECF No. 68 at 5.)  However, Jacobson does not support the NAACP's point.  In Jacobson, the plaintiffs challenged Florida's ballot order scheme that was enacted in 1951; the applicable statute of limitations was four years.  The court rejected the defendant's theory that the plaintiffs' claims were barred because they failed to bring their claims before 1955 when the statute of limitations ran.  However, the court rejected this theory because the ballot scheme at issue was applied to all elections and the plaintiffs' "contend their rights were violated each time an election was held and the challenged statute was enforced."  Id. at 1264.  Because

Davis was fully desegregated and Stonewall Jackson was named) occurred significantly more than two years ago.  Thus, the Equal Protection claim based, as it is, on naming the schools is time-barred.

Recognizing that verity, the NAACP contends that Claim 2 presents a continuing violation.  A "continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation." Nat'l Advert. Co. v. City of Raleigh, 947 F.2d 1158, 1166 (4th Cir. 1991) (quoting Ward v. Caulk, 650 F.2d 1144, 1147 (9th Cir. 1981)) (internal quotation marks omitted).  Therefore, the "challenged action must be repeated within the statute of limitations period." Id. at 1167.  In this case, the challenged action of the School Board naming Lee-Davis and Stonewall Jackson has not been repeated within the statute of limitations period.  Any alleged disparate impact is an alleged ill effect from the original violation of naming the schools.  Thus, the continuing violation doctrine cannot save Claim 2.

---

the most recent election occurred in 2016 (two years before the plaintiffs filed suit), the court decided that the statute of limitations did not bar the plaintiffs' claims. Id. Unlike in Jacobson, the challenged action of naming the schools has not happened within the past two years.  Additionally, the Eleventh Circuit recently vacated and remanded the district court's decision with instructions to dismiss for lack of justiciability because the plaintiffs did not prove an injury in fact and thus lacked standing. Jacobson v. Fla. Sec'y of State, No. 19-14552, 2020 WL 2049076, at *1 (11th Cir. Apr. 29, 2020).

Consequently, Virginia's statute of limitations bars Claim 2, and Claim 2 will be dismissed.

### 2. The Alleged Disproportionate Impact

Even if Claim 2 were not time-barred, Claim 2 must be dismissed because it fails to allege specific plausible facts and instead relies on conclusory statements.[8] The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "In order to survive a motion to dismiss an equal protection claim, a plaintiff must plead sufficient facts to demonstrate plausibly that he was treated differently from others who were similarly situated and that the unequal treatment was the result of discriminatory animus." Equity in Athletics, Inc. v. Dep't of Educ., 639 F.3d 91, 108 (4th Cir. 2011). "An equal protection violation occurs in one of two ways: (1) when the government explicitly classifies people based on race, or (2) when a law is facially neutral, but its administration or enforcement disproportionately affects one class of persons over another and a discriminatory intent or animus is shown." Monroe v. City of Charlottesville, 579 F.3d 380, 388 (4th Cir. 2009); see also Vill.

---

[8] "Ordinarily, it is preferable to articulate a single basis for decision and, conversely, to refrain from making alternative holdings." Amato v. City of Richmond, 875 F. Supp. 1124, 1139 (E.D. Va. 1994). However, as explained supra note 4, it is appropriate to provide alternate reasoning in this case.

of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."). Equal protection violations on the basis of race are subject to strict scrutiny. See, e.g., Fisher v. Univ. of Tex., 570 U.S. 297, 307-08 (2013). Additionally, although education is not a fundamental right, San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 36-39 (1973), if a state chooses to provide it, it "is a right which must be made available to all on equal terms," Brown v. Bd. of Educ., 347 U.S. 483, 493 (1954).

In this case, Lee-Davis and Stonewall Jackson's names and student body and team names are the same for students of all races. Consequently, the disparate impact analysis focuses on whether these names disproportionately affect African-American students. Although the NAACP points to several cases in which courts have stated that certain governmental actions, such as segregation, have disparately impacted African Americans, (see, e.g., ECF No. 51 at 13-14), these cases are not analogous because of the difference in degree between, for example, segregation, on the one hand, and attending schools with Confederate names and symbols on the other. For instance, Brown v. Bd. of Educ., 347 U.S. 483 (1954), concerned de jure segregation, which is significantly different from students attending schools with Confederate-based names. Although "black students undoubtedly view[] the

26

Confederate symbols as a persistent affront, given the association
between those symbols and the history of slavery in this country,"
Crosby ex rel. Crosby v. Holsinger, 816 F.2d 162, 163 (4th Cir.
1987), to state a claim for relief, the NAACP must plead sufficient
facts to plausibly show that its members were disproportionately
impacted by the schools' names and student body and team names.
Instead of pleading sufficient facts, the NAACP relies solely on
conclusory statements, including but not limited to:

- By creating an environment that glorifies racial oppression, Defendants subject African American students, including NAACP members, to a hostile education environment. Defendants subject African American students to a different and inferior educational experience than that afforded to white students, for whom the racially hostile environment has a less damaging impact. (ECF No. 1 ¶ 80.)

- African American students at Lee-Davis HS and Stonewall Jackson MS confront everyday messages from the school that they are less worthy than their white counterparts. These messages are harmful and cause long-lasting injury. (Id. ¶ 86.)

- Given the Confederacy's connection to slavery as an institution and the prominence of Davis, Jackson, and Lee in its leadership, Defendants' decision to name two public schools "Lee-Davis High School" and "Stonewall Jackson Middle School" discriminates against African American students on its face. (Id. ¶ 124.)

- The school names, and team and student-body names, disparage, humiliate, and harm African American students and their families by using a government stamp of approval to honor the Confederacy. (Id. ¶ 127.)

27

- The endorsement of the school names and their use throughout the school culture subject African American students to severe, pervasive, and objectively offensive racial harassment. (Id. ¶ 128.)

- The school names and team names discriminatorily impact African American members of the NAACP by using a government stamp of approval to honor the Confederacy and all that the symbols of the Confederacy stand for today. (Id. ¶ 132.)

- [T]he school names and team and student-body names treat African American members of the NAACP differently because the names and team and student-body names cause particularized psychological harm that affects their sense of self-worth and have short- and long-term impacts on their well-being that are not experienced by white students. (Id. ¶ 133.)

- The school names, and team and student-body names, treat African American students, including members of the NAACP, differently because the names constructively prevent them from attending Lee-Davis HS and Stonewall Jackson MS and . . . burden African American students and their families who are forced to move, to travel to a school located farther from home, or to home-school their children rather than endure the humiliation and discriminatory impact of attending those schools. (Id. ¶ 134.)

- The school names, and team and student-body names, treat African American members of the NAACP differently because the names and team and student-body names constructively prevent them from participating in school-sponsored events and activities . . . because such activities involve Confederate speech and symbolism that further disparages and humiliates African American students and their families. . . . African American students are forced to give up a well-rounded high school experience and make choices that other

students outside of their racial identity
group are not forced to contend with. (Id.
¶ 135.)

- The school names of "Lee-Davis" and "Stonewall
  Jackson" and the team and student-body names
  of "Confederates" and "Rebels" create[] a
  school environment that denies African
  American students, including members of the
  NAACP, an equal opportunity to an
  education . . . . (Id. ¶ 136.)

- As a result of the discriminatory and
  discouraging impact of the [Defendants']
  decisions . . ., African American students,
  including the members of the NAACP . . ., do
  not receive the same curricular and
  extracurricular experience at Lee-Davis HS and
  Stonewall Jackson MS that their white peers
  can experience. (Id. ¶ 137.)

It is not appropriate, in deciding the Motion, to decide whether

there is merit to these conclusory statements. The issue here is

whether the Complaint alleges specific facts that plausibly

support Claim 2. Quite clearly, the above-listed statements are

entirely conclusory, and the Complaint does not otherwise "contain

sufficient factual matter, accepted as true, to state a claim to

relief that is plausible on its face." Rockville Cars, LLC v.

City of Rockville, 891 F.3d 141, 145 (4th Cir. 2018) (quoting

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)) (internal quotation

marks omitted). Claim 2 will consequently be dismissed for the

additional reason that it fails to state a claim upon which relief

can be granted.

### d.   Claim 3 Fails to State a Claim for Relief.

Claim 3 is based on the Equal Educational Opportunities Act (the "EEOA"), which provides, in relevant part, that "[n]o State shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by . . . the failure of an educational agency which has formerly practiced such deliberate segregation to take affirmative steps . . . to remove the vestiges of a dual school system . . . ." 20 U.S.C. § 1703(b). Claim 3 will be dismissed because, even if it is assumed that the schools' names and student body and team names constitute vestiges within the meaning of the EEOA, the Complaint relies on conclusory statements.

"As a substantive matter, the EEOA provides protections similar to those provided by the Equal Protection Clause." United States v. City of Yonkers, 96 F.3d 600, 620 (2d Cir. 1996). The underlying "purpose of the EEOA is equality of educational opportunity." Jackson v. Waller Indep. Sch. Dist., No. H-07-3086, 2009 WL 3078489, at *14 (S.D. Tex. Sept. 24, 2009). "Section 1703(b) is violated if a school district that formerly practiced segregation fails to take affirmative steps to remove the vestiges of a dual school system, defined as one that assigns students to schools on the basis of race or other impermissible criteria. . . . [T]here must . . . be a finding that there are vestiges of the former dual school system and that the educational

agency failed to take affirmative steps . . . to remove those vestiges." Id. at *13. "In formulating a remedy for a denial of equal educational opportunity or a denial of the equal protection of the laws, a court . . . shall . . . impose only such remedies as are essential to correct particular denials of equal educational opportunity or equal protection of the laws." 20 U.S.C. § 1712.

### 1.  The School Board Is Subject to the EEOA.

The School Board argues that the EEOA does not apply to the School Board because the EEOA "is intended to eradicate the lingering effects of segregated education systems" and the School Board no longer has a dual school system. (ECF No. 26 at 22; see also ECF No. 36 at 9.) That argument is mistaken. The EEOA clearly refers to educational agencies that have "*formerly* practiced such deliberate segregation." 20 U.S.C. § 1703(b) (emphasis added). That the School Board no longer practices deliberate segregation does not exempt the School Board from the EEOA's requirements. See, e.g., id.; United States v. Sch. Dist. of Ferndale, 577 F.2d 1339, 1345 (6th Cir. 1978) ("The fact that all [plaintiffs] are now attending programs that are integrated to some degree does not prevent assertion that they are being denied equal educational opportunity."). "[S]tudents in integrated programs may still be denied equal educational opportunity if those programs fail to remove the vestiges of a dual school system." Sch. Dist. of Ferndale, 577 F.2d at 1345 n.7 (quoting 20 U.S.C.

31

§ 1703(b))   (internal   quotation   marks   omitted).     Consequently,

because the School Board "operated segregated schools until 1963,"

(ECF No. 63 ¶ 13), it is subject to the EEOA.

### 2.   The EEOA Provides a Remedy for Violation of Its Terms.

The School Board also mistakenly argues that 20 U.S.C. § 1713

does not provide a remedy for the violations alleged in the

Complaint.    It is true that § 1713 merely requires that courts

consider the enumerated equitable remedies.    Section 1713 provides

that:

> In formulating a remedy for a denial of equal
> educational opportunity or a denial of the
> equal protection of the laws, which may
> involve   directly   or   indirectly   the
> transportation   of   students,   a
> court . . . *shall consider and make specific
> findings* on the efficacy in correcting such
> denial of the following remedies and shall
> require implementation of the first of the
> remedies set out below or of the first
> combination thereof which would remedy such
> denial . . . .

20 U.S.C. § 1713 (emphasis added).   The section subsequently lists

various remedies, including: (1) assigning students to schools

closest to their residences; (2) allowing students to transfer

schools; (3) creating or revising "attendance zones or grade

structures without requiring transportation"; (4) constructing new

schools and closing "inferior schools"; and (5) developing and

implementing "any other plan which is educationally sound and

administratively feasible . . . ." Id.

Also, by its own terms, § 1713 only "directs a court to consider the efficacy of several equitable remedies in correcting a denial of equal educational opportunity." Mumid v. Abraham Lincoln High Sch., 618 F.3d 789, 798-99 (8th Cir. 2010) (quoting 20 U.S.C. § 1713) (internal quotation marks and emphasis omitted) (holding that "the language and structure of the EEOA firmly indicate that Congress authorized only equitable remedies for violations of the statute").    In other words, "Section 1713 . . . sets forth a priority of remedies that a court must consider in formulating a remedy for a denial of equal educational opportunity."    Id. at 798 (quoting 20 U.S.C. § 1713) (internal quotation marks and alteration omitted).    Moreover, although § 1713 does include a clause concerning denials of equal educational opportunity involving the transportation of students, "the reference [to the transportation of students] comes in a non-restrictive clause set off by commas" and, "therefore, does not limit the application of § 1713 to cases that involve that particular remedy." Id.

Additionally, other sections make clear that courts can impose equitable remedies beyond those numerated in § 1713.    For instance, 20 U.S.C. § 1712 more broadly discusses how courts should formulate remedies and provides that courts "shall . . . impose only such remedies as are essential to correct particular denials of equal educational opportunity or equal protection of the laws."

20 U.S.C. § 1712. Similarly, Section 1706 provides that an "individual denied an equal educational opportunity . . . may institute a civil action . . . against such parties, and for such relief, as may be appropriate." 20 U.S.C. § 1706. Therefore, the EEOA only "limits court-ordered remedies to those that are essential to correct particular denials of equal educational opportunity," not to those remedies listed in § 1713. See Issa v. Sch. Dist. of Lancaster, 847 F.3d 121, 131 (3d Cir. 2017) (quoting Horne v. Flores, 557 U.S. 433, 450 (2009)) (internal quotation marks and emphasis omitted). Consequently, Section 1713 does not preclude courts from imposing forms of equitable relief other than those specifically enumerated, such as an injunction requiring the schools' names to be changed.

### 3. Vestiges

Section 1703(b) provides that states cannot deny equal educational opportunity by "the failure of an educational agency which has formerly practiced such deliberate segregation to take affirmative steps . . . to remove the vestiges of a dual school system." 20 U.S.C. § 1703(b). Consequently, "there must first be a finding that there are vestiges of the former dual school system and that the educational agency failed to take affirmative steps . . . to remove those vestiges." Jackson v. Waller Indep. Sch. Dist., No. H-07-3086, 2009 WL 3078489, at *13 (S.D. Tex. Sept. 24, 2009).

The "EEOA does not define 'vestiges of a dual school system.'" Id. at *12; see also 20 U.S.C. § 1720 (defining terms, but not defining "vestiges"). "Vestige" is generally defined as "a trace, mark, or visible sign left by something (such as an ancient city or a condition or practice) vanished or lost." *Vestige (Noun)*, Merriam-Webster, https://www.merriam-webster.com/dictionary/vestige. Within the school segregation context, "vestiges are those effects of intentional discrimination, which, if left unremedied, perpetuate the hallmarks of the regime of school segregation." G. Scott Williams, *Unitary School Systems and Underlying Vestiges of State-Imposed Segregation*, 87 Colum. L. Rev. 794, 800 (1987). "The vestiges of segregation that are the concern of the law in a school case may be subtle and intangible but nonetheless they must be so real that they have a causal link to the *de jure* violation being remedied." Freeman v. Pitts, 503 U.S. 467, 496 (1992); see also United States v. City of Yonkers, 197 F.3d 41, 46 (2d Cir. 1999) (requiring "an adequate causal link between the regime of *de jure* segregation and any ongoing remediable deficiency"). "The causal link between current conditions and the prior violation is even more attenuated if the school district has demonstrated its good faith." Freeman, 503 U.S. at 496. "It need not be shown that such vestiges have a discriminatory purpose, only that they have a discriminatory effect." City of Yonkers, 197 F.3d at 50.

Whether names and mascots of a school can constitute a vestige is unclear, and courts have considered whether something is a vestige on a case-by-case basis.  See, e.g., id. at 45-46, 51-53 (concluding that "low teacher expectations for minority students" and "insufficiently multi-cultural approach to curriculum and teaching techniques" were not vestiges because of lack of evidence); Jackson, 2009 WL 3078489, at *13-14 (rejecting argument that "relatively poorer physical facility of a historically black school, standing alone, would violate the statute" because there was evidence that school was either equal or as good as other schools).  Consequently, whether school names and mascots can constitute vestiges of segregation appears to be an issue of first impression.

Several courts have noted that Confederate names and symbols are, at the very least, divisive, and some courts have even recommended that school authorities eliminate Confederate school symbols.  Banks v. Muncie Cmty. Schs., 433 F.2d 292, 297-98 (7th Cir. 1970) ("This Court would recommend to the school authorities that they exercise their discretion to bring about the elimination of school symbols which are offensive to a racial minority. . . . The student body's choice of [Confederate] symbols has been shown to be personally offensive to a significant number of the students, no matter how innocuous the symbols may originally have seemed to the young, white students."); see also Crosby ex

36

rel. Crosby v. Holsinger, 816 F.2d 162, 163 (4th Cir. 1987) ("The black students undoubtedly viewed the Confederate symbols [including athletic teams called the "Rebels" and the "Confederettes"] as a persistent affront, given the association between those symbols and the history of slavery in this country."); Augustus v. Sch. Bd. of Escambia Cty., 507 F.2d 152, 155 (5th Cir. 1975) (modifying district court order but noting that district court "found that the use of the [Confederate] symbols was racially irritating to many black students"); Gray v. Lowndes Cty. Sch. Dist., 900 F. Supp. 2d 703, 710 (N.D. Miss. 2012) (expressing strong disapproval of school's nickname of "Confederates" and stating that "the court can discern no good reason why a Mississippi public school would wish to associate itself with any divisive nickname or symbol."). The court in Gray, 900 F. Supp. 2d at 710-11, noted that the continued use of the nickname "Confederates" by a school not named after Confederate officers and leaders was a "troubling" issue. Id. Although the court also acknowledged that "some will say 'we mean no harm, we are only honoring our heritage,'" it emphasized that the "use of [Confederate] words and symbols in a pejorative sense hardly advances the causes of education or personal and community growth. . . . There is nothing harmful in essence in pictures of Confederates or the playing of a tune. The harm comes to institutions and individuals when such symbols are used to

37

purposely offend, provoke or hurt another.   Such outcomes are not legitimate aims of public education." Id.

Although Lee-Davis and Stonewall Jackson's names and respective school body and team names—the Confederates and the Rebels—may well be offensive to some of the NAACP's members, the Complaint fails to allege facts sufficient to state a claim for relief that is plausible on its face. See Rockville Cars, LLC v. City of Rockville, 891 F.3d 141, 145 (4th Cir. 2018).   The Complaint does allege that the School Board formerly practiced segregation and resisted desegregation attempts.   (ECF No. 1 ¶¶ 143-45.)   However, the Complaint relies on conclusory statements with respect to the impact of the school, team, and student body names on African-American students and does not identify or explain what equal educational opportunities are being denied or how they are being denied.   For instance, the Complaint only alleges that:

> African American members of the NAACP are
> denied equal educational opportunities on
> account of their race because of the
> Defendants' failure to remove these vestiges.

(Id. ¶ 147.)   The Complaint further alleges that:

> African American students are denied equal
> educational opportunities because the
> deliberate retention of the school names
> creates a stigma against and feeling of
> inferiority among African American students
> who attend Lee-Davis HS and Stonewall Jackson
> MS.

(Id. ¶ 148.)  These statements, including that the names create a "stigma" and "feeling of inferiority," are conclusory statements on which the Court cannot rely.  See Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  Even if the school, team, and student body names constitute vestiges—which is a question the Court need not reach at this stage—Claim 3 must be dismissed for failure to state a claim because the Complaint neither alleges sufficiently plausible facts regarding the names' impact on African-American students nor adequately explains how or what equal educational opportunities students are being denied.

**CONCLUSION**

For the foregoing reasons, HANOVER COUNTY SCHOOL BOARD'S MOTION TO DISMISS (ECF No. 25) will be granted, and the COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF (ECF No. 1) will be dismissed.

It is so ordered.

                    /s/       REP

                  Robert E. Payne
                  Senior United States District Judge

Richmond, Virginia
Date: May 13 , 2020